# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

ANTHONY HODGES,         )

                                  )

       Petitioner,      )       NO. 3:04-00176

                                  )       JUDGE HAYNES

v.                             )

                                  )

TONY PARKER, Warden,    )

                                  )

       Respondent.    )

## M E M O R A N D U M

Petitioner, Anthony Hodges, a state prisoner filed, this pro se action under 28 U.S.C. § 2254, seeking for the writ of habeas corpus to set aside his state convictions for first degree murder and aggravated child abuse. For the murder conviction, Petitioner was sentenced to life imprisonment without parole and received a twenty-five (25) years concurrent sentence for the aggravated child abuse conviction. After a review of the pro se petition, the Court appointed the Federal Public Defender to represent Petitioner. In earlier proceedings, the Court denied the Respondent's motion for summary judgment without prejudice to renew upon the filing of an amended petition. This action was temporarily closed until the Respondent filed the state records as ordered by the Court, but Respondent failed to do so. (Docket Entry No. 46).

In his amended petition, Petitioner asserts the following claims:

1.     The state trial court's erroneous criminal-responsibility instruction violated Petitioner's rights under the Due Process Clause of the Fourteenth Amendment and wrongfully foreclosed Hodges' only defense to first-degree murder;

2.     The State failed to provide Hodges with Brady material, in violation of the Sixth and Fourteenth Amendments;

3.     The State presented perjured testimony that violated his rights under the Due Process Clause of the Fourteenth Amendment;

4.      The prosecution's improper closing arguments violated the defendant's rights under the Due Process Clause of the Fourteenth Amendment;

5.      The prosecution relied on theories at the co-defendant's trial that contradicted those asserted at Petitioner's trial and thereby violated his rights under the Due Process Clause of the Fourteenth Amendment;

6.      The trial court wrongfully excluded evidence necessary to his defense and thereby violated his rights under the Due Process Clause of the Fourteenth Amendment;

7.      Petitioner's counsel provided ineffective assistance in failing to seek instruction on the lesser-included offense of aggravated assault; failing to object to the prosecutor's improper arguments; making excessive concessions in his closing argument; failing to make a reasonable investigation; and failing to permit Hodges to testify;

8.      Petitioner was denied due process when the trial court failed to instruct the jurors on the lesser-included offense of second-degree murder;

9.      Petitioner was denied due process by the state trial court's considering of an element of the offense in deciding whether to allow the possibility of parole; and

10.     The trial court violated Hodges' due process rights by failing to suppress the testimony of E.J. Bernard, a state witness.

(Docket Entry No. 33, Amended Petition at pp. 23-48).

Respondent filed an answer to the amended petition and contends that many of Petitioner's claims, including arguments based upon Brady, the use of perjured testimony and prejudicial closing argument were never presented to the state courts and are defaulted. As to Petitioner's claims about the State's use of inconsistent theories at the Petitioner's co-defendant's trial, certain omissions of Petitioner's trial counsel and the trial court's failure to instruct on the lesser included offenses of second degree murder, Respondent contends that those claims are also waived and procedurally defaulted for Petitioner's failure to present those claims to the state courts.

2

As ordered, the parties filed a joint pretrial order setting forth their claims and defenses and have filed briefs on the merits. (Docket Entry Nos. 33, 74 and 78).

## A. Procedural History

A jury convicted Petitioner in January 1997 of first degree felony murder and aggravated child abuse and sentenced him to life without parole for the murder. Petitioner received a concurrent 25 year sentence on the aggravated child abuse conviction. Petitioner appealed his conviction and sentence to the Tennessee Court of Criminal Appeals that affirmed his convictions and sentence. (Docket Entry No. 11, Addendum No. 3). On September 13, 1999, the Tennessee Supreme Court denied his application to appeal.

Petitioner then filed a state post-conviction petition and after an evidentiary hearing, the trial court denied the petition. On appeal, the Tennessee Court of Criminal Appeals affirmed the trial court's order denying the petition. Hodges v. State, No. M2001-03068-CC-R3-PC, 2002 WL 31739872 (Tenn. Crim. App. Dec. 4, 2002). The Tennessee Supreme Court denied permission to appeal on September 19, 2003. Id.

## B. Review of the State Court's Record

In Petitioner's direct appeal, State v. Hodges, 7 S.W.3d 609 (Tenn. Crim. App. 1999), the Tennessee Court of Criminal Appeals set forth its extensive findings of the facts[1] underlying Petitioner's convictions.

> In this case, the evidence clearly establishes that the young victim, Miyoshi Richardson, died of blunt force trauma as a result of intentional blows to her head and torso. In addition, it is decisively apparent that either the mother, Kena Hodges, or the step-father, Defendant, inflicted the fatal injuries and that the

---

[1]State appellate court findings in its opinion can constitute factual findings under 28 U.S.C. § 2254(e). Sumner v. Mata, 449 U.S. 539, 546-47 (1981).

3

victim was in the sole custody of Defendant throughout the day of her death. The State could not show, however, which person-if only one-actually administered the blows; but it argues that it nevertheless met its burden of proof.

Metropolitan Nashville and Davidson County police officers testified that they were dispatched to Defendant's home at approximately 5:00 p.m. on December 28, 1995. A paramedic unit was present at the scene when the officers arrived, but medical personnel were preparing to leave. The officers observed the victim, a twenty-eight month old child, on a couch as they entered the home. At that time, officers observed that the child was already stiff with rigor mortis, had the appearance of having been deceased for some time, had a large bruise with swelling on the left side of her face, and had dried blood in one nostril. The officers moved the victim to a back bedroom while awaiting the medical examiner.

Officers confiscated several items of physical evidence from the residence, including a bed sheet, a pair of pants, a towel, a diaper, a cotton pad, a sponge, and a child's sweat shirt. Testing by the Tennessee Bureau of Investigation (TBI) revealed the presence of blood on these items. FN2 Officers also seized a coat hanger that had been bent and secured with tape, which was hanging on a hook in the victim's room. While the State characterized this hanger as evidence of punishment, the defense argued that it may have been simply a tool for turning on lights above the child's reach. In addition, the State presented evidence of other items taken from the house, including a mop, that it characterized as having been used to clean the home. The mop was wet when seized, but the TBI found no traces of blood on it.

> FN2. Only one item contained enough blood to determine identity. The blood on that item-the shirt-belonged to the victim.

The medical examiner, a forensic pathologist, examined the victim's body at the scene of the crime, after another representative from the examiner's office had pronounced the child dead. Photographs introduced at trial depicted bruising of her skin along the left side of her face, with abrasions on the side of the face and around the eye, and bruising apparent on her arms and legs. The doctor testified that the victim also had a laceration inside her left nostril and on the inside of her upper lip, and additional abrasions on her hands and legs.

The next day, the medical examiner performed an autopsy on the victim and determined that she died as a result of blunt force injury of the head and torso. Several more contusions, lacerations, and abrasions were found over various parts of the victim's body, including her chin, lower lip, ear, abdomen, buttocks, knee, heel, tongue, and hands. The doctor testified that all external manifestations of injury were consistent with blunt force-type trauma, and that injuries to the child's

4

hands were characteristic of defensive wounds. Finally, areas of the victim's scalp were visible through her hair, indicating that her hair may have been pulled from her head.

Upon internal examination, the medical examiner ascertained that the victim suffered hemorrhaging underneath the scalp; between the brain and skull, underneath the protective membrane of the brain; and on the surface of the brain itself. Hemorrhaging also appeared around the optic nerves and within the eyes themselves. The victim's liver was lacerated and contained areas of hemorrhage. All internal injuries remained consistent with blunt force trauma, and hemorrhages of the victim's eye region were compatible with injuries received from violent, forceful shaking. The doctor concluded that the victim's death resulted from multiple blows to the child's head and torso, and that the blows were intentional-they were inconsistent with any type of accidental injury.

The doctor then testified regarding the victim's probable status during the day of her death. He opined that, while conscious, the victim would likely have been irritable from likely headache and nausea, with increasing lethargy and decreasing activity. Next, the child would have slipped into unconsciousness, followed by coma and then death. Although the doctor could not determine the exact time that death occurred, he estimated that, based upon the extent of rigor mortis present at his 5:30 p.m. examination, the victim had been dead for at least several hours up to twelve hours or longer. According to the medical examiner, if the child's injuries had been inflicted at or before approximately 6:00 a.m. on the day of her death, the bruises would have been visible and apparent by noon, and probably much earlier.

2. Statements by Anthony and Kena Hodges

The primary proof presented by the State to show how, when, and by whom the injuries to Miyoshi were inflicted was gleaned from the sometimes consistent, sometimes conflicting statements by Anthony and Kena Hodges to police. Detective Kent McAlister of the Metropolitan Police Department testified concerning many of the statements made by the Hodges.

Defendant related that he and the victim had been alone together throughout the day of her death. Kena Hodges left the home for work at approximately 6:30 a.m. and did not return until shortly before 5:00 p.m. McAlister stated that, at the scene, Defendant explained the child's facial bruises by telling officers she had fallen off of the commode earlier in the day. Separately, Kena stated at the scene that the child had fallen in her presence that morning, hitting her head on the bathroom heater.

McAlister requested the Hodges to appear at the Criminal Justice Center later the

5

same evening for extended interview, which they did. In that interview, Defendant told McAlister that early in the morning, while Kena prepared for work, he heard a "boom" from the bathroom. According to Defendant, Kena told him that the child had fallen and hit her head on the bathroom heater, burning her hair. During this statement, Defendant denied seeing this first fall and stated that the victim acted normally after it occurred, although she did not cry or complain, as she usually would.

In addition, Defendant informed McAlister that around 10:00 a.m., he saw the victim stumble once, and he placed the victim on the commode because she had partially soiled her clothes. While the victim was in the bathroom, Defendant walked to the kitchen to feed their dog. When he heard a loud noise from the bathroom, he returned to find the child lying on the floor. He stated that though she appeared to be all right, she fell again while trying to walk out of the room. Following these falls, Defendant noted that the victim appeared sleepy and less responsive, and she seemed "in a daze." He then put the child to bed. Defendant spoke with his wife by telephone between 10:00 and 11:00 a.m., and he informed her that the child had fallen and seemed extremely sleepy. According to Defendant, Kena reassured him that the child was merely tired because she hadn't had much sleep the night before.

Kena telephoned Defendant at approximately 12:30 p.m., and Defendant informed her that the child was still sleeping. In his statement, Defendant told police that he was then worried about Miyoshi because he thought she should be awake. Kena reportedly again told Defendant to let the child sleep-that she was tired. Kena called back at approximately 2:00 p.m., at which time Defendant told her the victim was still sleeping and that he wanted to wake her. He took a wet towel and squeezed it over her face and told his wife that "it looked like she moved her eyes." Kena again told Defendant the child was just sleepy, but he told Detective McAlister that he knew something was wrong:

> And I said ... something just don't seem right because she normally be up because I at this point I had my stereo on in the living room I said music is up and I said the dog been barking you know I said there's commotion going on and my wife said well go get her. So I went to the bed, got her, brought her out and my wife was on the other line and my wife I said well baby you talk to her maybe you can call her and maybe she'll respond and my wife started you know Miyoshi, Miyoshi, Miyoshi, Miyoshi and I said it look like she moving and my wife said well check her temperature and she told me the thermometer which we have a home thermometer is in the ... bathroom cabinet so I went back to the cabinet and got the thermometer cleaned off, put it in her mouth, flushed it.

6

....... It seemed like she was [responding] and my wife just kept because my wife was, you know, coaching me more or less along because I told my wife she shouldn't be asleep this long. My wife kept telling me she's tired, she's sleepy. I said she shouldn't be asleep this long.

When asked how she seemed to be responding, Defendant told Detective McAlister that "[s]he would open her eyes just like vaguely, like a sleepy ... look, partially like you know vaguely just open them with a sleepy look." During the same conversation with his wife, Defendant remarked that he thought Miyoshi might have had a seizure because it looked as though she had been biting her tongue. According to Defendant, Kena told him the child had not had a seizure and to put her to bed. Defendant therefore put the victim back to bed. He denied noticing anything unusual about her appearance other than her lack of responsiveness. When asked about the discoloration of her face, he stated that he assumed she bruised herself in the falls, but that he did not notice when the bruises appeared on her face.

Kena Hodges arrived home shortly before 5:00 p.m. and attempted to wake the victim. In his statement, Defendant told McAlister that "she started playing with the baby's like legs she said the baby is some kind of, you know, medical term word she used I don't know, she said the baby is well tight." They called the child's grandmother to tell her the child was dead. They then called 911. Defendant stated that after the paramedics informed the Hodges that the child was conclusively dead,

> ... it hit home and, you know, I was breaking down at that point and she was strong. She was telling me, baby, you know, it was my fault. I was saying, baby, it's my fault cause I should have had, you know, when the baby fell out a couple of times called the, you know, ambulance then and what not.

Defendant gave another statement to police the next night, December 29, 1995. During that statement, Detective McAlister informed Defendant that the victim died from being beaten, not from falling, and implored him to tell police what had happened the previous day. Defendant immediately denied beating the child, and he admitted that Kena sometimes acted abusively toward Miyoshi. When asked the last time he remembered Kena "over discipline" the victim, Defendant responded, "Thursday morning," the day of her death. He stated, "I honestly don't believe she just fell I mean it was a throw ...," and he indicated that he heard Kena say to the child in the bathroom, "Get the f__k out of here you mother f__kin' bitch. I'll kick your f__king ass."

Defendant continued to repeatedly maintain that he did nothing to harm the

7

victim, and he explained his scraped knuckle and bruised toe by insisting that he helped his neighbor move several large appliances the day before Miyoshi died. When pressed again, the following exchange occurred:

ANTHONY: Earlier in the morning my wife well my wife was abusive with her....

MCALISTER: What'd she do?

ANTHONY: First she hit her in the sink. I was in the bed sleep and I know she hit her head on the side of the coming out of our bathroom there is a fire well fireplace, no heater and you know boom, I heard the noise....

MCALISTER: ... [T]ell us what happened, tell us what you saw?

PINKERTON: What kind of conversation and what did you see?

ANTHONY: I seen her with her hair going to the door. I mean it's like, get your ass up, you know and boom

MCALISTER: Boom what?

ANTHONY: Kicking her[.]

MCALISTER: Kicking her where?

ANTHONY: From the bathroom[.]

MCALISTER: Kicking her where did she kick her on her body?

ANTHONY: In her in her ass or between her legs or whatever because it tipped up out into the bedroom.

PINKERTON: So where did she, where did she land when she fell when she got kicked out of the bathroom?

\* \* \*

ANTHONY: I have a, what is it, a milk crate. I have an old milk crate. It was closer down. I use it as a night stand. She hit that and moved it back.

PINKERTON: What part of her body hit the milk crate?

ANTHONY: Well she was upside down. She had flipped and so the milk crate was like moved and I moved the milk crate back in the corner.

8

PINKERTON: And what time of morning was this?

ANTHONY: Is [sic] was about six-fifteen right before she had to go to work. Six something.

MCALISTER: So she kicked her one time.

* * *

ANTHONY: No she was pretty abusive.

MCALISTER: Well explain to me what pretty abusive is. Would you please explain that to me. I guess I'm just dumber than a rock.

ANTHONY: She made the baby stand up in the corner all night.

* * *

PINKERTON: Which night are we talking about?

ANTHONY: We're talking about Wednesday, Thursday, Thursday morning.

PINKERTON: Talking about the night before the baby's death.

ANTHONY: Right. She made the baby stand up in the corner and hold her hands up on the wall.

PINKERTON: Why? Why did she say she done that? Why?

ANTHONY: The baby girl said she had to pee and then so she slept in the corner all night.

PINKERTON: Standing up? What did you say about that?

ANTHONY: Baby put the baby to bed.

* * *

ANTHONY: Okay. F__k you you don't have nothing to say about, you know. I said, baby, put the baby to bed....

PINKERTON: So y'all slept in the bed and the baby standing in the corner

9

ANTHONY: With her hands up.

PINKERTON: When did you notice that she got up and the baby was out of the corner?

ANTHONY: I noticed possibly all night one o'clock, two o'clock, three o'clock, she'd holler at the baby, are you ready to say something, you ready to say something. She would get up and get her normal[.]

PINKERTON: Get up and get what? We don't know what normal is.

ANTHONY: Smack the baby, hit the baby. You can't say you gotta go to bed, you can't say you gotta go to the bathroom.

PINKERTON: When she hit her after she was standing and you woke up one of those few times you woke up and she was hitting her, when she slapped the baby where did the baby hit? Did she hit her head on anything else? Or did she just slap her and the baby just stood still or did she fall down or what?

ANTHONY: She was constantly falling. Constantly giving up.

* * *

PINKERTON: How often did this happen?

ANTHONY: Too much.

Upon cross-examination, Detective McAlister testified to several statements made by Kena Hodges over the same time period-the evening of her daughter's death, December 28, 1995, and the next night, technically the early morning hours of December 30, 1995. During her first interview, Kena told McAlister that Miyoshi had fallen and hit her head on the bathroom heater. Later, when apparently confronted with Defendant's statements inculpating her,FN3 Kena denied ever kicking the victim, yet she admitted inflicting some harm. Kena told detectives that she had struck the child lightly with a plastic coat hanger, causing her to fall and hit her head against the bathroom sink.

> FN3. The transcript of Kena's interview begins abruptly, and the
> record does not reflect the conversation prior to the beginning of
> what has been recorded; but Kena has clearly been informed
> somehow of allegations that she kicked the child.

In her statement, Kena expressed disbelief that her actions caused the child's death, but she accepted responsibility if that were indeed the case. McAlister

testified to her words:

> "I'm hurt. Don't think I'm not hurt. And I feel bad, because, like I said, I don't believe that that's what did it to her, but I guess it did, so I'm wrong.... *619 I was thinking of anybody and anything but me. I couldn't believe this was me, but I'm being honest. It's not enough to say, I'm sorry. It's not enough to say, I didn't think that would happen.

*  *  *

> I didn't think that would result from that. It's not enough. It's not enough and you're right. And it's not enough for me to say that I should have, would have, could have. It's not enough. Her life is gone, and I'm being honest. True enough, I don't-I don't think I was a negligent Mama. I guess I was negligent then. Abusive, I don't think I was abusive, but I guess I was abusive then. I don't think I was a bad parent. I made a mistake and I'm wrong. I guess I've got to pay for it. I hate to be honest, you know, I guess this is going to be said in court, played in court, whatever. I'm being honest in my heart. Don't think I don't feel bad. I have felt bad since it happened. I'm truly a Christian, but I make mistakes. I do wrong. This was one, true enough. Hey, you-all are saying it's a biggie. It is a biggie. I do feel bad. Now, I'm not going to say I want you-all to just believe me. I'm not going to sit here and just lie and say, hey. But, now, I guess if I did-did it, I'd be, I guess I'll keep saying it, if because I still don't want to believe that, it was me. But if I did it, I did it, and I'm wrong. I'm not trying to pass the buck. I'm not trying to point fingers, and I'm not going to steer you wrong."

Officers asked Kena why she failed to admit the prior night that she hit the victim with a coat hanger, and she responded that she blocked the incident out of her mind because she did not believe she caused harm to the child:

> "I guess I want to block that out. I did not even remember that, but after I sat there, I thought about it and say, you know, what now, that I think about it. Three blows to the head. It might have been just me, now that I think about it, after I thought about what really happened."

McAlister testified that, to his knowledge, Kena had not mentioned before that she hit her daughter three times. Finally, the detective testified to Kena's words shortly before police arrested her: "'Jesus, I am so sorry, Miyoshi. I never wanted to do nothing to you. How many years does a person go to jail for something like this?'"

11

Upon redirect examination of Detective McAlister, the State presented evidence that at the first interview, in response to the question of whether Defendant had struck the victim in a harmful manner, Kena stated,

> "No, and that was much-we loved Miyoshi, like I said, and you know, but this incident, he called me during the day, because he wanted for me to reassure him, because he's like I said, he's real nervous about this, so he didn't know-so he just went on what I said, like I said, feel bad because I feel I should have did more, but like I assume, she asleep, you know...."

To impeach the credibility of Kena's statements implicating herself, the State also introduced Kena's earlier statement that she did not know exactly where or how the victim fell in the bathroom: "I guess that's when she fell. I can't say I saw it...." In addition, the jury heard this account by Kena through McAlister:

> "I said, Baby, don't worry about it. Should I call the ambulance? I was like, Baby, no. I said, no, and I admit that, because I'm thinking, there ain't nothing wrong with her. And that's the honest truth, and I was telling everybody on my job, well, my husband was nervous about my daughter. And if you ask him, he's a little nervous about her, but I don't think wrong [sic] with her. Betty punches me to herself, and says, get over-and says, get over it. She's fine. He's just overreacting. And I don't know. And so then I was telling him little things to do to her and stuff to try and hear her. I was like, well Baby, take her in the tub and lay her in the tub and just take a little cold water and put it on her belly. That will probably make her squint, you know, if the temperature. No, Baby, it's too cold to do that. I don't want to make her cold. I said, okay, well, that's understandable, you know.
>
>                \*   \*   \*
>
> And so, I said, well, Baby, I don't think nothing wrong. I think she fine. You're just overreacting."

The general substance of this telephone call and another that day were verified by Kena's co-worker, who heard Kena speak. According to Kena's statement, Defendant called her back soon thereafter to request her to come home as soon as possible because of the child's condition. Regarding pain or marks on the victim, Detective McAlister testified that Kena stated,

> "Like I said, I did not notice those things before I had left. I didn't

12

see them, and I didn't do them, and I didn't see him do any while I was there. I don't believe he did while I was not there. I didn't see it and he didn't tell me if he did.... Like you-all are saying, you trying to figure out whether it was him, or whether it was me, and I'm trying to be like, I know for a fact it wasn't me."

Finally, the State introduced this conversation between police and Kena: " 'Who's been doing it?' ... 'It was not me.' ...'Who's been doing it?' ... "Him.' "

Id. at **614-619. The state appellate courts other factual findings are set forth in the context of the Petitioner's specific claims.

## C. Conclusions of Law

Actions under 28 U.S.C. § 2254 are governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 412-13 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." In such instances, the Supreme Court held that a federal habeas court may grant a writ. Id. at 413. The Supreme Court interpreted the language "clearly established

13

Federal law, as determined by the Supreme Court of the United States" as referring to "the holdings as opposed to the dicta" of its decisions at the time of the state court decision. Id. at 412. Moreover, the relevant analysis is "to apply a rule of law that was clearly established at the time [the Petitioner's] state-court conviction became final." Id. at 390; accord Joshua v. DeWitt, 341 F.3d 430, 436 (6th Cir. 2003). In Bell v. Cone, 535 U.S. 685, 693 (2002), the Court reiterated that the AEDPA modified the court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under the law."

Under the "unreasonable application" clause, the Supreme Court stated that a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies [that principle] to the facts of the particular case." Id. at 694. "Even if a federal court could determine that a state court incorrectly applied federal law, the court still could not grant relief unless it also finds that the state court ruling was unreasonable." Cristini v. McKee, 526 F.3d 888, 897 (6th Cir. 2008). The district court "must presume that all determinations of factual issues made by the state court are correct unless the defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)).

For habeas relief, all federal law claims must be fairly and properly presented to the state courts. Picard v. Connor, 404 U.S. 270, 275 (1971). A claim supported only by citation to state law is insufficient to present a federal claim, even if the cited state decision restated an analysis of federal law. Anderson v. Harless, 459 U.S. 4, 7 n.3 (1982) (per curiam). As to how the facts

14

and federal legal theory must have been "fairly presented" to the state courts, in <u>Duncan v. Henry</u>, 513 U.S. 364, 365-66 (1995) (<u>per curiam</u>) (citing <u>Picard</u> and <u>Anderson</u>), the Supreme Court stated: "If state courts are to be given the opportunity to correct alleged violations of prisoners, federal rights, they must surely be alerted to the facts that the prisoner are asserting claims under the United States Constitution." <u>Id.</u> <u>Duncan</u> modified and heightened the <u>Picard</u> standard. <u>Id.</u> at 367 (Stevens J., dissenting).

If a properly presented federal law claim is not adjudicated in the state courts, the AEDPA is inapplicable. <u>Maples v. Stegall</u>, 340 F.3d 433, 436 (6th Cir. 2003). In such instances, the Court "'reviews questions of law and mixed questions of law and fact <u>de novo</u>.'" <u>Id.</u> (citations omitted). If a state court decides a federal law claim, but "does not squarely address the federal constitutional issue in question, but its analysis bears 'some similarity' to the requisite constitutional analysis, we must carefully review both the record and the applicable law, and may reverse only if we conclude that the State recent decision is contrary to or an unreasonable application of federal law." <u>Filiaggi v. Bagley</u>, 445 F.3d 851, 854 (6th Cir. 2006) (quoting <u>Maldonado v. Wilson</u>, 416 F.3d 470, 476 (6th Cir. 2005)). In any event, this modified AEDPA standard "[n]onetheless bars the court from reversing unless the state's court's decision is contrary to or an unreasonable application of federal law.'" <u>Maldonado</u>, 416 F.3d at 476.

In reaching this decision, the Supreme Court reiterated that the claims were to be decided on the record before the state court:

> In this and related contexts <u>we have made clear that whether a state court's decision was unreasonable must be assessed in light of the record the court had before it.</u> See <u>Yarborough v. Gentry</u>, 540 U.S. 1, 6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (<u>per curiam</u>) 124 S.Ct., at 4 (denying relief where state court's application of federal law was "supported by the record"); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 348, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (reasonableness of state court's

15

factual finding assessed "in light of the record before the court"); cf. Bell v. Cone, 535 U.S. 685, 697, n. 4, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).

Holland v. Jackson, 542 U.S. 649, 652 (2004) (emphasis added). The district court also "must presume that all determinations of factual issues made by the state court are correct unless the Defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 738 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). This presumption includes credibility findings of the state courts. Skaggs v. Parker, 235 F.3d 261, 266 (6th Cir. 2001).

Of the Petitioner's claims, the Court addresses first Petitioner's undisputed exhausted claims.

### 1. Ineffective Assistance of Counsel Claim

As pertinent to this action, in his post-conviction appeal, Petitioner presented the following claims about his trial counsel:

The Defendant contends on appeal that his trial attorneys, Mr. Richard Tennent and Mr. Karl Dean, were ineffective in their representation of him prior to and at trial in the following respects:

1. Mr. Tennent conceded the Defendant's guilt during closing argument;

\* \* \*

6. They failed to request a jury instruction on aggravated assault;

7. They failed to object to improper closing arguments by the State; and

Hodges, 2002 WL 31730872 at *1.

In that appeal, the Tennessee appellate court made the following findings of fact on Petitioner's exhausted claims of ineffective assistance of counsel at trial.

In support of these allegations, the Defendant called attorneys Tennent and Dean

16

at the post-conviction hearing and introduced portions of Mr. Tennent's closing argument.

Mr. Tennent testified that the defense theory was that Mr. Hodges didn't inflict any injuries on the child, that Kena Hodges brutally beat the child, that he did not know how badly [sic] these injuries were. And that he did, in fact, take action to deal with it. His actions were insufficient, of course, but he did call Kena, relating to the mother of the child that the child was sick ... seemed to be in some form of distress. And I believe we put on witnesses from the day care center where Kena worked, where Kena was, basically, telling him it's no big deal, don't worry about it, something to that effect. So our position was that he just had no idea of how bad this was, that he had not encouraged, in any way, shape, or form, the abuse that Kena had applied to the child, that it was entirely her action. And he had no reason to know until it was too late how bad this was.

Mr. Tennent acknowledged that, during closing argument, he told the jury that his client had lied to the police about what Kena Hodges had done the night before Miyoshi died, that the Defendant was a "coward" for not stopping Kena from beating the child, and that he was "spineless" for not saving the child's life. Mr. Tennent conceded that his closing argument was, in part, "tactically, not a good decision, in retrospect."He explained his argument as being intended to maintain credibility with the jury, not to concede the Defendant's guilt. In response to the Defendant's questions about Mr. Tennent's closing argument, Mr. Dean explained that "this was a difficult case" and that Mr. Tennent "did the best he could under the situation."

*   *   *

With respect to a jury instruction on aggravated assault, Mr. Tennent and Mr. Dean both testified that they did not recall why they did not request that instruction.

*   *   *

The Defendant testified that there was nothing in his past that he wanted to be kept from a jury. He explained that he told Mr. Tennent "repeatedly" that he wanted to testify on his own behalf at trial and stated that he would have testified at the trial that he had never been involved in any physical abuse of Miyoshi, that he would have called an ambulance if he had realized how seriously the child was hurt, and that he was "not responsible for what her mother did to her that day."On cross-examination the Defendant admitted to two prior felony convictions for burglary and arson; he also admitted that he had been charged in the past with criminal trespass regarding a residence and domestic assault.

17

Id. at **1-2.

On post conviction appeal, the Tennessee appellate court adopted the trial court's finding

and cited federal and state law on these exhausted claims as follows:

> [T]he trial court found as follows`
>
> The Court is of the opinion that the trial attorney who handled this matter, Mr.
> Richard Tennent, performed his duties in a diligent and competent manner.
> Additionally, the Court is of the opinion that co-counsel Karl Dean is a very
> experienced trial attorney who has tried many first degree murder cases prior to
> this case. The Court is of the opinion that the trial attorneys in this matter, Richard
> Tennent and Karl Dean, performed their duties in an appropriate and competent
> manner.
>
>         \*     \*     \*
>
> We agree with the trial court that the Defendant received the effective assistance
> of counsel at trial. FN1 Those actions of trial counsel of which the Defendant
> complains and about which he adduced proof at the post-conviction hearing were
> based on tactical decision made in the midst of preparing for and conducting a
> difficult first degree murder trial. While Mr. Tennent may have conceded in
> retrospect that he might have done some things differently, this Court does not
> review tactical decisions through the lens of hindsight. The Defendant has failed
> to demonstrate by clear and convincing evidence that either or both of his trial
> lawyers' performance fell below the standard of competence demanded by the
> law. Accordingly, the Defendant is entitled to no relief on this basis.
>
> > FN1Both lawyers testified that they did not remember their
> > analyses regarding a jury instruction on aggravated assault. We
> > cannot, therefore, characterize the omission of this instruction as a
> > "tactical decision." Nevertheless, even if the Defendant's trial
> > lawyers erred in failing to request this instruction, the Defendant
> > has not demonstrated a reasonable probability that, but for the
> > alleged error, the jury would have had reasonable doubt regarding
> > the Defendant's guilt of first degree murder. That is, the omission
> > of a jury instruction on aggravated assault in this case does not
> > undermine our confidence in the outcome of the Defendant's trial.
> > Accordingly, this allegation of ineffective assistance of counsel is
> > without merit.

Id. at 3, 4 n.1.

18

To evaluate these claims, the Sixth Circuit summarized the Supreme Court's precedents governing legal principles on ineffective assistance of counsel claims. Mitchell v. Mason, 325 F.3d 732 (6th Cir. 2003). In Mitchell, the Sixth Circuit identified two broad categories of ineffective assistance of counsel claims: (1) the actual or effective absence of counsel at the critical stage of the proceeding for which presumed prejudice arises; and (2) counsel whose performance was deficient on specific issues and was demonstrably prejudicial to the defendant. As that Court explained:

> In United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)... the Supreme Court held that an appeals court must reverse a criminal defendant's conviction "without any specific showing of prejudice to defendant when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." Cronic, 466 U.S. at 659 n. 25. In other words, when counsel is totally absent during a critical stage of the proceedings, prejudice must be presumed. . . . In Williams, the Supreme Court confirmed the vitality of this "per se" approach, noting that while the Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), test for ineffective assistance of counsel, requiring proof of deficient performance and prejudice provides guidance for resolving virtually all ineffective assistance of counsel claims, there are "a few situations in which prejudice may be presumed." Williams, 529 U.S. at 391 . . . (citing Strickland, 466 U.S. at 692, 104 S.Ct. 2052). We have recently applied the presumption-of-prejudice test to a claim of ineffective assistance of counsel. Olden, 224 F.3d at 568 (prejudice is presumed when counsel is absent during prosecution's presentation of evidence that implicates defendant because such absence occurred during "critical stage" of trial).
>
> *   *   *
>
> Within the first category are three types of presumptive ineffectiveness of counsel: The first is the complete denial of counsel, in which "the accused is denied the presence of counsel at 'a critical stage.'" Bell, 122 S.Ct. at 1851 (quoting Cronic, 466 U.S. at 659, 104 S.Ct. 2039). The second is when counsel "'entirely fails to subject the prosecutions' case to meaningful adversarial testing.'" Id. (quoting Cronic, 466 U.S. at 659, 104 S.Ct. 2039). The third is when counsel is placed in circumstances in which competent counsel very likely could not render assistance.

Id. at 740, 742. Here, Petitioner's claims falls within the second category.

19

To establish ineffective assistance of counsel, it must be shown that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable.

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Id. at 687.

In any event, Strickland directs that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 689, 691. As the Supreme Court noted, "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." Id. at 691 (emphasis added).

Applying Strickland standards, the state appellate court's characterization of Petitioner's trial counsel's cited act and omissions, during closing argument as tactical decisions is reasonable and with experienced trial counsel, the State courts could reasonably conclude that counsel's omissions was neither deficient nor prejudicial. As to trial counsel's failure to request a lesser instruction, the state courts deemed this omission not to be prejudicial. Given that the defense theory was that Petitioner did not commit the abusive acts, the Court concludes that state

20

court's conclusion on the lack of prejudice is not unreasonable.

## 2. The Criminal Responsibility Instructions

In this claim, Petitioner asserts that his sole defense was that he did not recognize that his daughter's condition required emergency medical care. Over Petitioner's objection, the prosecutors requested and the trial court delivered a jury instruction on criminal-responsibility from the juvenile code that Petitioner owed a duty as a witness of child abuse to report such abuse to authorities. Petitioner contends that with this criminal responsibility instruction and Petitioner's proof, the jury was effectively instructed to find Petitioner guilty of first-degree murder, if Petitioner had merely witnessed, but failed to report his wife's abuse of the child. Petitioner also argues that this instruction relieved the State of its burden of proving all elements of first-degree murder.

On direct appeal, the Tennessee Court of Criminal Appeals ruled that in view of the trial courts' entire jury instructions, the juvenile code instruction was harmless error.

> Defendant next contends that the trial court committed an error of constitutional magnitude when it instructed the jury on the third section of criminal responsibility for the conduct of another and a juvenile criminal statute mandating that persons who have knowledge of child abuse report such abuse to the authorities. See Tenn. Code Ann. §§ 39-11-402(3), 37-1-403. Specifically, the trial court instructed:
>
>> The defendant is criminally responsible for an offense committed by the conduct of another if having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with the intent to benefit in the proceeds or results of the offense or to promote or assist its commission, the defendant fails to make a reasonable effort to prevent commission of the offense.
>
> In a later instruction, separated by nineteen pages of the record, the trial court advised the jury,
>
>> Any person having knowledge of or called upon to render aid to

21

any child who is suffering from or has sustained any wound, injury,
disability or physical or mental condition which is of such a nature
as to reasonably indicate that it has been caused by brutality, abuse
or neglect or which on the basis of available information
reasonably appears to have been caused by brutality, abuse or
neglect shall report such harm immediately by telephone or
otherwise to the judge having juvenile jurisdiction or to the county
office of the Department of Human Services or to the office of the
Sheriff or the chief law enforcement official of the municipality
where the child resides. Persons includes, but is not limited to
neighbor, relative, friend or any other person.

We conclude that, while the latter instruction was likely not warranted by the facts
of this case, its inclusion was not erroneous; and furthermore, if erroneous, such
error was harmless beyond a reasonable doubt.

We find that these instructions were charged to the jury each separate from the
other, with no indication from the trial court that the jury should consider them
together and with no further instruction that the latter constituted a "duty imposed
by law" under the former. Had the jury decided that Defendant failed to report
child abuse in violation of this instruction, such a decision nevertheless should
have had no bearing on fulfillment of the criminal responsibility statute, because
the third criminal responsibility prong requires "a duty imposed by law ... to
prevent commission of the offense." Tenn.Code Ann. § 39-11-402(3) (emphasis
added). Failing to report child abuse, by its terms, is an altogether different
proposition and does not satisfy this prong of criminal responsibility. The two
instructions combined created no error. Therefore, we now contemplate whether
the instructions given alone created error.

"It is the duty of the trial court to give a complete charge of the law applicable to
the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn.1986) (citing
State v. Thompson, 519 S.W.2d 789, 792 (Tenn.1975)); see State v. Burkley, 804
S.W.2d 458, 461 (Tenn. Crim. App. 1990). In this case, the State presented a
theory by which the jury could conclude that Defendant was criminally
responsible for Kena Hodges's actions. We have determined that the evidence was
sufficient to find Defendant guilty of criminal responsibility for felony murder by
reason of Defendant undertaking the obligation to care for and protect a young,
helpless child. Therefore, we find that the trial court was warranted in charging
the jury with the third prong of criminal responsibility-having a duty imposed by
law.

The second instruction, dealing with failure to report child abuse, we find to be
essentially irrelevant. Defendant was not charged under the juvenile code with
failure to report child abuse, nor does this instruction assist the trier of fact in

22

determining any issue relevant to a charged offense. Our supreme court addressed irrelevant jury instructions in Adcock v. State, 191 Tenn. 687, 236 S.W.2d 88 (Tenn.1949), and Pedigo v. State, 191 Tenn. 691, 236 S.W.2d 89 (1951), in which improper jury instructions required reversal of convictions. We find both cases distinguishable from the case at bar.

In Pedigo, the supreme court described the jury instruction as follows:

A photostat of the charge as it was handed to the jury, convinces us that by reason of incompetent and irrelevant matter, illegible interlineation and meaningless annotation, the charge might as well have been written in a foreign language and could serve no purpose except to confuse the jury.

236 S.W.2d at 90. Here, we have only a single irrelevant instruction, no illegible interlineation and no meaningless annotation. This case clearly does not rise to the magnitude of the impropriety in Pedigo. Turning to Adcock, the predecessor to Pedigo and the case of Pedigo's co-defendant, we find that the written instructions given to the jury "contained not only points of law applicable to the ... case, but also much that was inapplicable and confusing." Furthermore,

> [n]ot only did [the Adcock jury] receive much law that had no application to the facts of this case, but they were also given instruction on many facts which were not in evidence and were contrary to the theory of the Defendant.

> The defense of the accused was an alibi. In the charge taken by the jury to the jury room, it was stated ..., "the Defendant admits that he did the killing, but says that it was done by him in his own necessary self-defense, etc." Then follows an elaborate charge on self-defense.

Again, we conclude that the case at bar clearly does not reach the significance of Adcock. We find no reversible error in the trial court's inclusion of this accurate and non-misleading, yet irrelevant instruction.

Hodges, 7 S.W.3d at 627-29 (emphasis added).

For this claim, Petitioner relies upon Carella v. California, 491 U.S. 263, 265 (1999) that

"[j]ury instructions relieving the State of this burden [of proving each element of an offense]

violate a defendant's due process rights. Such directions subvert the presumption of innocence

accorded to accused person and also invade the truth-finding task assigned solely to juries in

23

criminal cases." Petitioner also cites <u>Barker v. Yukins</u>, 199 F.3d 867, 874 (6th Cir. 1999); and

<u>Martinez v. Garcia</u>, 379 F.3d 1034, 1035-36 (9th Cir. 2004).

For habeas relief on the basis of incorrect jury instructions, a habeas petitioner must show

more than that the instructions are undesirable, erroneous or universally condemned and must

prove that as a whole, the jury instructions were so infirm to render the trial fundamentally

unfair. <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977). <u>See</u> <u>also</u> <u>Estelle v. McGuire</u>, 502 U.S.

62, 72, 73 (1991) ("[w]e also bear in mind our previous admonition that we `have defined the

category of infractions that violate "fundamental fairness" very narrowly,'" quoting <u>Dowling v.</u>

<u>United States</u>, 493 U.S. 342, 352 (1990). An example of jury instructions offending this

constitutional limitation is <u>Sandstrom v. Montana</u>, 442 U.S. 510, 524 (1979), where the Supreme

Court ruled unconstitutional a jury instruction that presumes a person intends to commit the

natural, ordinary and usual consequences of his voluntary actions. Yet, if the habeas petitioner

had counsel, an impartial adjudicator and the State's evidence proved his guilt of the offense

beyond a reasonable doubt, a strong presumption arises that the <u>Sandstrom</u> error is harmless.

<u>Neder  v. United States</u>, 527 U. S. 1, 8 (1999); <u>California v. Roy</u>, 519 U.S. 2, 4-5 (1996); <u>Rose v.</u>

<u>Clark</u>, 478 U.S. 570, 579-80 (1986).

<u>Carella</u> involved a "mandatory" presumption that the defendant embezzled property. 491

U.S. at 265. Here, Petitioner was not charged with failure to report child abuse and the

Tennessee appellate court quoted the instructions that the duty under the juvenile code applies

only if the defendant had "voluntarily undertaken to prevent commission of the offense . . . or to

prevent or assist its commission." <u>Hodges</u>, 7 S.W.3d at 627. The facts about Petitioner's

conduct here do not establish this standard. In this context and given that the Petitioner had

24

effective and able trial counsel, the State's proof of Petitioner's active involvement in causing multiple rapes and injuries to the victim, the State proved the Petitioner's guilt beyond a reasonable doubt. Thus, this Court concludes that the state appellate court could reasonably conclude that considering the jury instruction as a whole, any error on this instruction was harmless error.

### 3. Exclusion of evidence for Petitioner's defense

At trial, Petitioner attempted to call two witnesses who had known his family during the approximately six to seven months they lived in Nashville. According to Petitioner, those witnesses would have testified that on earlier occasions, Kena Hodges struck the victim, including, dragging the victim down the street by the arm. In addition, these witnesses' purported testimony would be that Kena Hodges hit the child while Petitioner was momentarily absent. Petitioner contends this ruling deprived him of his right to present the jury with such evidence regarding another suspect's motive or intent, citing <u>Sawyers v. State</u>, 83 Tenn. 694, 695 (1885); <u>State v. Cureton</u>, 2003 WL 22303084, at *14-17 (Tenn. Crim. App. Oct. 8, 2003) (regarding evidence of child abuse inflicted months before the fatal injury).

As to the exclusion of this evidence, on direct review, the Tennessee Court of Criminal Appeals ruled as follows:

> In his fourth issue, Defendant argues that the trial court erred by refusing to permit Defendant to present evidence through the testimony of two witnesses that Kena Hodges, the victim's mother, had abused the child in the past. The State argues, and the trial court agreed, that Tennessee Rule of Evidence 404(b) mandates the inadmissibility of this evidence. In response, Defendant cites State v. Smith, 868 S.W.2d 561, 574 (Tenn.1993), <u>State v. Turnbill</u>, 640 S.W.2d 40, 46-47 (Tenn. Crim. App.1982), and <u>State v. Glebock</u>, 616 S.W.2d 897, 905-06 (Tenn. Crim. App.1981), for the proposition that evidence of prior acts of violence against the victim are relevant to show motive and intent to commit the offense.

25

Tennessee Rule of Evidence 404(b) reads:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
>
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

The State correctly notes that, once the above criteria of Rule 404(b) have been satisfied, the appropriate standard of review is whether the trial court abused its discretion when ruling upon the admissibility of evidence at trial. State v. DuBose, 953 S.W.2d 649 (Tenn. 1997). The trial court followed the strictures of Rule 404(b) by conducting a hearing out of the presence of the jury; by ruling on the record that the evidence was being offered to show the propensity of Kena Hodges to commit abuse, rather than for any other purpose; and by indicating that the evidence was cumulative-that the record already reflected other similar evidence. The trial court, therefore, must be afforded an abuse of discretion standard of review.

State v. Smith, relying upon Turnbill and Glebock, held that "violent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." 868 S.W.2d at 574. Here, we have a distinguishable case: the State does not seek to introduce evidence against the accused; rather, Defendant seeks to introduce evidence that another person, Kena Hodges, committed a prior violent act against the victim.

Examining Rule 404(b) in conjunction with Rule 401, this evidence may or may not be relevant evidence in this case-that is to say, it may or may not have "any tendency to make the existence of any fact that is of consequence to the action more probable or less probable than it would be without the evidence." Tenn. R. EvId. 401. Assuming that under Rule 404(b), prior violent acts against the victim can be relevant evidence of motive and intent to commit the acts again, evidence

26

in this case that Kena had abused the child could be relevant evidence that she had abused Miyoshi on the day of her death, but it would not make abuse or neglect by Defendant any less likely. Therefore, we conclude that the trial judge did not abuse his discretion by denying admission of this evidence.

State v. Hodges, 7 S.W.3d at 626-27.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment . . . or in the Compulsory Process of Confrontation clauses of the Sixth Amendment . . . the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." Crane v. Kentucky, 476 U.S. 683, 690 (1980) (internal citations and quotations removed). Yet, a question of purely state law rarely serves as a basis for habeas corpus relief. McGuire, 502 U.S. at 72, 73. An issue concerning admissibility of evidence does not arise to a level of constitutional magnitude unless it can be viewed as so egregious that petitioner was denied a fundamentally fair trial. See Cooper v. Sowders, 837 F.2d 284, 286 (6th Cir. 1988). To warrant habeas relief, the excluded evidence must be critical. That is, the evidence must "tend to exculpate" the petitioner and also must contain "persuasive assurances of trustworthiness." Turpin v. Kassulke, 26 F.3d 1392, 1396 (6th Cir. 1994).

Given the State's proof of the Petitioner's multiple injuries to the victim, the Tennessee appellate court could reasonably conclude that "evidence that [Petitioner's wife] had abused Miyoshi on the day of her death ... would not make abuse or neglect by Defendant any less likely. Therefore, we conclude that the trial judge did not abuse his discretion by denying admission of this evidence." Hodges, 7 S.W.3d at 627.

### 4. Defaulted Claims

Petitioner concedes that his claims about the prosecutor's closing argument and his trial counsel's failures to make a reasonable investigation and to permit Petitioner to testify are

27

procedurally defaulted (Docket Entry No. 70 at 15, 19) and Petitioner abandons those claims.

Yet, Petitioner insists that he can establish cause and prejudice for his other defaults.

The Supreme Court defined the "Procedural Default Doctrine" for federal habeas

proceedings as barring federal habeas relief in the certain instances:

> [t]his Court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment. This rule applies whether the state law ground is substantive or procedural. In the context of direct review of a state court judgment, the independent and adequate state ground doctrine is jurisdictional. Because this Court has no power to review a state law determination that is sufficient to support the judgment, resolution of any independent federal ground for the decision could not affect the judgment and would, therefore, be advisory.
>
>                        *   *   *
>
> . . . the doctrine applies also to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement. In these cases, the state judgment rests on an independent and adequate state procedural ground.

Coleman v. Thompson, 501 U.S. 722, 729-30 (1992) (emphasis added and citations omitted).

The rationale for this doctrine arises out of federal respect for federalism and maintaining

comity with state courts:

> In the habeas context, the application of the independent and adequate state ground doctrine is grounded in concerns of comity and federalism. Without a rule, a federal district court would be able to do in habeas what this Court could not do on direct review; habeas would offer state prisoners whose custody was supported by independent and adequate state grounds an end run around the limits of this Court's jurisdiction and a means to undermine the State's interest in enforcing its laws.
>
>                        *   *   *
>
> [A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to

28

address those claims in the first instance. . . .In the absence of an independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court. The independent and adequate state ground doctrine ensures that the State's interest in correcting their own mistakes is respected in all federal habeas cases.

Coleman, 501 U.S. at 730, 732.

The Supreme Court further recognized that state procedural rules also serve a legitimate state interest in finality of criminal convictions:

Plainly the interest in finality is the same with regard to both federal and state prisoners. ... There is no reason to ... give greater preclusive effect to procedural defaults by federal defendants than to similar defaults by state defendants. To hold otherwise would reflect an anomalous and erroneous view of federal-state relations.

Francis v. Henderson, 425 U.S. 536, 542 (1976) (quoting Kaufman v. United States, 394 U.S. 217, 228 (1969)).

In Murray v. Carrier, 477 U.S. 478 (1986), the Supreme Court noted that state procedural rules channel the controversy to the state trial and appellate courts.

A state's procedural rules serve vital purposes at trial, on appeal, and on state collateral attacks. ... Each state's compliment of procedural rules ... channel[s] to the extent possible, the resolution of various types of questions to the stage of the judicial process at which they can be resolved most fairly and efficiently. Failure to raise a claim on appeal reduces the finality of appellate proceedings, deprives the appellate court of an opportunity to review trial error, and undercut[s] the state's ability to enforce its procedural rule[s].

Id. at 490-91 (quoting Engle, 456 U.S. at 129, and Reed v. Ross, 468 U.S. 1, 10 (1984)).

The first step in this analysis is whether Petitioner's claims in this action were fairly presented to the state courts. For habeas review, a federal habeas court must consider the merits of claims that the petitioner "fairly presented" to the state courts. Tuggle v. Seabold, 806 F.2d 87, 91 (6th Cir. 1986). To fairly present a federal claim to a state court, a petitioner can: (1) rely

29

on federal cases interpreting the federal constitutional provision involved; or (2) state cases interpreting the federal constitutional provision involved; (3) assert a claim in terms that call to mind the specific right guaranteed by the federal constitution; or (4) allege a factual pattern within the mainstream of federal constitutional litigation. Dietz v. Money, 391 F.3d 804, 808 (6th Cir. 2004). Yet, "mere similarity of claims is insufficient to exhaust." Duncan v. Henry, 513 U.S. 364, 366 (1995).

Even if the state courts have not found default, the court must consider whether the state courts would bar the claims, if those disputed claims were presented to them. A district court cannot review a claim:

> [I]f the petitioner failed to exhaust, state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred. In such a case there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claim.

Coleman v. Thompson, 501 U.S. 722, 735 n. 1 (1991) (citing Harris v. Reed, 489 U.S. 255, 269-270 (1989) (O'Conner, J., concurring); Teague v. Lane, 489 U.S. 288, 297-298 (1989). The Tenth Circuit refers to this as an "anticipatory procedural default," Moore v. Scoemay, 288 F.3d 1231, 1233 n.3 (10th Cir. 2002).

There is a presumption of no procedural default and thus, no adequate and independent state grounds to bar federal habeas relief, if the state court decision "fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of [the] state law ground is not clear from the face of the opinion." Coleman, 501 U.S. at 735.

An actual ruling on a presented claim by the state court is not required for federal habeas

review.  Smith v. Digmon, 434 U.S. 332, 333-34 (1978).  Moreover, a petitioner is not required

to present to the state court every specific fact which he presents to the federal court.  Federal

courts can consider supplemental evidence that was not presented to the state court if that

evidence does not "fundamentally alter the legal claim already considered by the state court."

Vasquez v. Hillery, 474 U.S. 254, 260 (1986).

In the Sixth Circuit, the analysis under procedural default doctrine was set forth in the

Maupin v. Smith, 785 F.2d 135, 138 (6th Cir. 1986):

> When a state argues that a habeas claim is precluded by the petitioner's failure to
> observe a state procedural rule, the federal court must go through a complicated
> analysis.  First, the court must determine that there is a state procedural rule that is
> applicable to the petitioner's claim and that the petitioner failed to comply with the
> rule.
>
>       \*     \*     \*
>
> Second, the court must decide whether the state courts actually enforced the state
> procedural sanction.
>
>       \*     \*     \*
>
> Third, the court must decide whether the state procedural forfeiture is an
> "adequate and independent" state ground on which the state can rely to foreclose
> review of a federal constitutional claim.... This question generally will involve an
> examination of the legitimate state interests behind the procedural rule in light of
> the federal interest in considering federal claims.

Maupin, 785 F.2d at 138 (citations omitted).

### a.  Noncompliance with Applicable State Rules

Under Maupin, the threshold issue is the existence of an applicable state law rule and the

petitioner's noncompliance therewith.  Here, the Tennessee's limitations period in the Tennessee

Post-Conviction Act, Tenn Code Ann. § 40-30-102, was amended in 1995 to provide a one year

period of limitation and is now codified at Tenn. Code Ann. § 40-30-202.  Moreover, Tenn. Code

31

Ann. § 40-30-112(a) presumes that any issues not raised in an initial post conviction petition are waived and Tenn. Code Ann. § 40-30-112(b) that provides that any issues raised in a prior proceeding is previously determined and therefore barred from further consideration. For these procedurally default claims, the State records and state court opinions demonstrated Petitioner's non-compliance with these three provisions of Tennessee law.

### b. "Firmly Established" and "Regularly Followed" State Rules

To qualify for the procedural default rule, the cited state law must be "firmly established and regularly followed" at the time the claim arose. Ford, 498 U.S. at 423-24. As the Sixth Circuit explained, "[c]onsiderations of comity do not require a federal court to abstain from deciding a constitutional claim on grounds of procedural default where the state courts have not enforced a given state procedural rule." Rice v. Marshall, 816 F.2d 1126, 1129 (6th Cir. 1987).

Tennessee courts have enforced Tenn. Code Ann. § 40-30- 112(a) and (b) that were established in 1967 and 1971, as part of the Tennessee Post-Conviction Procedure Act. 1967 Tenn. Pub. Acts, 310 and 1971 Tenn. Pub. Acts 96. The "previously determined" provision of Tenn. Code Ann. § 40-30-112(a) has been regularly followed. See Harvey v. State, 749 S.W.2d 478 (Tenn. Crim. App. 1987), as reflected in the numerous annotations to Tenn. Code. Ann. § 40-30-112(a). Moreover, the waiver rule, Tenn. Code Ann. § 40-30-112(b)(1), is regularly enforced in state post-conviction proceedings, Holiday v. State, 512 S.W.2d 953 (Tenn. 1972), and § 40-30-112(b)(1), unless the claim was not cognizable at the time. Pruett v. State, 501 S.W.2d 807 (Tenn. 1973), cert. denied, 415 U.S. 994 (1974); Tenn. Code Ann. § 40-30-112(b)(2) or the petition is withdrawn before a decision on the merits. Williams v. State, 831 S.W.2d 281 (Tenn. 1992).

32

In Coe v. Bell, 161 F.3d 320, 331 (6th Cir. 1998), the Sixth Circuit held that the Tennessee courts strictly and regularly followed the waiver rule and ruled that the cited exceptions "are isolated and unpublished, and so are insufficient to defeat an otherwise strict and regular practice." In Cone v. Bell, 243 F.3d 961, 970 (6th Cir. 2001), the Sixth Circuit cited the waiver and previously determined provisions in § 40-30-111(a) and (b) to conclude that habeas claims were procedurally defaulted because "the state actually enforced the state rule."

As to the limitations period in § 40-30-102[2] that rule has been held to be strictly enforced with a narrow exception. Burford v. State, 845 S.W.2d 204, 209-10 (Tenn. 1992). In Hutchinson v. Bell, 303 F.3d 720 (6th Cir. 2002), the Sixth Circuit analyzed Tennessee's statute of limitations statute on post-conviction petitions and Burford exception in a procedural default analysis:

> Hutchinson argues that Tennessee courts' willingness to excuse procedural default pursuant to Burford demonstrates that state procedural rules are not regularly followed in the context of later-arising claims. Nevertheless, we agree that Tennessee's due process exception does not render this provision inadequate. Tennessee's due process exception does not grant unfettered discretion to state courts in applying procedural default rules. Although Tennessee courts will often permit the hearing of an untimely claim, the decision is confined by the due process standards delineated in Burford and its progeny. The Tennessee courts consistently enforce a procedural scheme that encompasses both the one-year limitations period and a court-recognized procedure for tolling that statute when specific due process grounds are presented . . . In Hannah v. Conley, 49 F.3d 1193 (6 th Cir. 1995) (per curiam), this Court found that the then-applicable three-year statute of limitations for post-conviction petitions in Tennessee was regularly applied and would bar presentation of an unexhausted claim. Id. at 1197. The Hannah court noted that the language of the statute was mandatory in that it provided that a claimant "must" petition within three years or his claim "shall" be barred. Id. at 1196. The current one-year statute of limitations contains the same mandatory language. See T.C.A. § 40-30-202(a).

---

[2]The limitations period in the Tennessee Post-Conviction Act was amended in 1995 to provide a one year period of limitation and is now codified at Tenn. Code Ann. § 40-30-202.

33

> Although the previous cases did not present a <u>Burford</u> type later arising claim, we do not find that the state's <u>Burford</u> tolling rules command a different result. Given that tolling under <u>Burford</u> is not discretionary and given this Circuit's reluctance to discourage state courts from exhibiting caution before applying procedural default rules in capital cases, we conclude that the <u>Burford</u> exception does not render Tennessee's procedural rules inadequate.

<u>Id.</u> at 738-739 (emphasis added and footnotes omitted).

The Sixth Circuit also ruled in <u>Hutchinson</u> that despite the Burford exception, its review of Tennessee's limitation period barred a petitioner's <u>Brady</u> claims because the exception to the Tennessee timeliness rule did not itself represent a constitutional claim and the Tennessee Court of Criminal Appeals did not review the merits of any federal constitutional claim.  <u>Id.</u> at 740-41.

> <u>Burford</u> exception does not depend upon the state court's determination of the merits of the petitioner's constitutional challenges to his conviction or sentence. Indeed, the Tennessee Court of Criminal Appeals expressly stated that it was not reviewing the merits of Hutchinson's <u>Brady</u> claim.  Because Hutchinson, like the petitioner in <u>Coleman</u>, does not assert that the state's denial of a second post-conviction hearing was itself a constitutional violation, the state court's decision not to apply the <u>Burford</u> exception is not reviewable by the Court.

<u>Id.</u>

In a word, <u>Hutchinson</u> found the Tennessee limitations rule to constitute a firmly established and regularly followed state law. Thus, the Court concludes the waiver, previously determined and limitations statutes, ruled upon by the state appellate courts in Petitioner's several appeals are regularly enforced.

### c.  Independent and Adequate State Rule

As to what is an independent and adequate state rule, the Supreme Court recognized the following state interests as constituting adequate grounds for state procedural rules.

The possible avoidance of an unnecessary trial or of a retrial, the difficulties of

making factual determinations concerning grand juries long after the indictment has been handed down and the grand jury disbanded, and the potential disruption to the numerous convictions of finding a defect in a grand jury only after the jury has handed down indictments in many cases.

Coleman, 501 U.S. at 745-46.

Another reason to support a finding of adequate state rules was articulated in Francis, wherein the Supreme Court enforced a state rule that promoted finality, noting a comparable federal rule.

Plainly the interest in finality is the same with regard to both federal and state prisoners. . . .There is no reason to . . . give greater preclusive effects to procedural default by federal defendants than to similar defaults by state defendants. To hold otherwise would reflect an anomalous and erroneous view of federal-state relations.

425 U.S. at 541-42. The Court stated that whether the state procedural ground is independent and adequate turns on the substantiality of the state interest. The state's interests in finality of judgment, judicial economy, and permitting defendants just one bite at the apple were deemed both obvious and substantial. An exception to this rule, however, arises "where state collateral review is the first place a prisoner can present a challenge to his conviction." Coleman, 501 U.S. at 755.

As to types of procedural rules that have been found to be independent and adequate, in Coleman, the Supreme Court upheld a procedural rule that bars consideration of a federal claim for failure to meet state law requirements for timely appeals. 501 U.S. at 750-51. "No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as in civil cases by the failure to make timely assertions of the right before a tribunal having jurisdiction to determine it. . . .No less respect should be given to state rules of procedure." Id. at 751 (quoting Yakus v. United States, 321 U.S. 414, 444 (1944). Accord

35

Brown v. Allen, 344 U.S. 443, 485-86 (1953) (procedural default rule applied a state rule that placed time limits on appellate rights).

In Cone, the Sixth Circuit found the waiver and previously determined rules in the former Tenn. Code Ann. §§ 40-30-111 (a) and (b) to be "independent and adequate" state rules.

> To repeat, they are: (1) that there is a state procedural rule applicable to Cone's claim and that he failed to comply with it; (2) that the state actually enforced the state rule; and (3) that Cone's noncompliance with the rule is an independent and adequate state ground for denying state review of a constitutional claim. Maupin, 758 F.2d at 138. As to the first requirement, the Tennessee waiver rule is plainly applicable to Cone's Brady claims; second, the Tennessee courts explicitly relied upon the waiver rule when deciding whether to consider Cone's post-conviction Brady claims' and third, the state's legitimate interest in required a defendant to raise all the claims he has at one time, thus avoiding multiple bites at the apple, is an independent and adequate state ground.

> We are satisfied the Cone's Brady claims have been procedurally defaulted in the Tennessee courts.

Cone, 243 F.3d at 970.

Based upon Coleman, Cone and Hutchinson, the Court concludes that Tennessee's limitations period for post-conviction petition as well as its waiver and previously determined statutes are independent and adequate state rules that promote the timely presentation of claims. This Court is bound by Cone on the firmly established and adequacy of these Tennessee statutes.

### d. The Cause and Prejudice Requirement

Once the respondent establishes procedural default, the burden shifts to the petitioner to show cause for the procedural default and actual prejudice or that the failure to consider the claim will result in a miscarriage of justice by the conviction of one who is actually innocent. Schlup v. Delo, 513 U.S. 298, 322 (1995); Murray, 477 U.S. at 488; and Coleman, 501 U.S. at 753. Cause for a procedural default must depend on some "objective factor external to the

36

defense" that interfered with the petitioner's efforts to comply with the procedural rule. <u>Coleman</u>, 501 U.S. at 752-53; <u>Murray</u>, 477 U.S. at 488.

> . . . we think that the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule. Without attempting an exhaustive catalog of such objective impediments to compliance with a procedural rule, we note that a showing that the factual or legal basis for a claim was not reasonably available to counsel, see Reed v. Ross, 468 U.S., at 16, or that 'some interference by officials,' Brown v. Allen, 344 U.S. 443, 486 (1953), made compliance impracticable, would constitute cause under this standard.

<u>Carrier</u>, 477 U.S. at 488.

### 5. **<u>Brady</u> Claims**

Petitioner's two <u>Brady</u> claims are based upon disciplinary matter involving Detective E.J. Bernard and  state witnesses' exculpatory testimony at Kena Hodges' trial, of Petitioner's remorse and implicating Kena Hodges as the murderer. Petitoner characterizes these as <u>Brady</u> material that should have been disclosed.  Although Respondent contends that Petitioner did not present these claims to any state court, Petitioner responds that he can establish cause and prejudice to excuse these procedural defaults.

Petitioner's <u>Brady</u> claim may excuse procedural default as the Sixth Circuit has stated:

> Suppression or favorable impeaching evidence by the state that results in an inability to raise claims relating to that evidence in state court establishes cause for the ensuing default.  <u>Id.</u>  The petitioner need not show that the prosecutor acted in bad faith or that defense counsel made a specific request for evidence . . . . However, unless the alleged <u>Brady</u> evidence is "material" for the purposes of the <u>Brady</u> rule, its "suppression d[oes] not give rise to sufficient prejudice to overcome the procedural default." (quoting <u>Strickland v. Greene</u>, 527 U.S. 263, 282 (1999) and <u>Hutchinson</u>, 303 F.3d at 741 (citing <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985)).

Moreover, under the Due Process Clause, if a habeas petitioner "demonstrates that the

37

prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury," the writ should issue. United States v. Agurs, 427 U.S. 97, 103 (1976) (citing Mooney v. Holohan, 294 U.S. 103 (1935)).

Bernard testified at trial about Petitioner's confession to the death of his child. According to Petitioner, prosecutors failed to disclose that the district attorney's office had earlier reprimanded Bernard for his untruthful testimony and repeated distortion of facts in a criminal investigation that resulted in a conviction. Petitioner contends that evidence of this investigation is critical and material impeachment evidence that would cast doubt on the credibility of Bernard's testimony about Petitioner's confession and raise questions as to the accuracy and veracity of Bernard's testimony. Petitioner also cites as perjured Bernard's testimony beyond his recorded and contemporaneous handwritten notes. The only actual proof is the affidavit of a member of the Metro murder squad that refers to objections of an assistant district attorney about Bernard's assignment to the murder squad and the affiant's personal opinion about Bernard.

As to Bernard, the state and appellate courts' factual findings extensively cite the Petitioner's statement to McAlister, not Bernard. The affidavit of the Metro murder squad member is relevant as to his personal experience with Bernard, but hearsay as to statements of the assistant district attorney. Here, Bernard had contemporaneous notes that imposed a limitation about Petitioner's statements and could be cross examined about any facts not in his report. The jury had the opportunity to make credibility decisions. The Court allowed Bernard to be deposed in this action, but that deposition was not filed. Given the state appellate finding, the Court concludes this Brady claim does not involve material evidence to establish cause or prejudice.

38

As to evidence in Kena Hodges's trial, Petitioner cites the testimony of the paramedic who arrived at the murder scene and described Petitioner as crying and sobbing over his child's death. Petitioner contends this testimony contradicts the State's argument that Petitioner did not demonstrate any remorse evincing his guilt. Petitioner also cites Deborah Lovely as a material witness who testified that Kena Hodges inculpating herself in her daughter's death. Finally, Petitioner cites the State's prior investigation of his finger injury that was not from hitting the child as exculpatory, though the State later argued otherwise.

On the postconviction appeal, the Tennessee appellate court addressed the inconsistent theories issue for which Petitioner did not present proof.

> The Defendant next argues that his due process rights were violated because the State argued inconsistent theories of criminal liability at the separate trials of him and his co-defendant, Kena Hodges. The trial court found that this issue was waived as having been available on direct appeal, and as having been "previously addressed" by the trial court. The Defendant does not take issue in his brief with the trial court's reasons for denying this claim for relief; he simply repeats the argument he makes in his Second Amended Petition in favor of this claim. <u>We are unable to determine from the record before us whether or not Kena Hodges' trial was conducted within the time frame available to the Defendant for inclusion of this alleged error in his direct appeal. It is the appellant's duty to prepare an adequate record on appeal. See Tenn. R.App. P. 24(b)."In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). The trial court denied relief on this basis, and we affirm that decision.</u>

<u>Hodges</u>, 2002 WL at *5 (emphasis added).

As to the state's use of inconsistent theories at Petitioner's and his wife's trials, "serious questions are raised when the sovereign itself takes inconsistent position in two separate criminal proceedings against two of its citizens." <u>Bradshaw v. Stumpf</u> 125 S.Ct. 2398, 2409 (2005) (Souter, J., concurring). "Such actions reduce criminal trials to mere gamesmanship and rob

39

them of their supposed purpose of a search for truth." Smith v. Grosse, 205 F.3d 1045 F.3d 1045, 1050 (8th Cir. 2000) (internal quotations and citation removed). Thus, "the use of inconsistent, irreconcilable theories to secure convictions against more than one defendant in prosecutions for the same crime" violates the Due Process Clause of the Fifth and Fourteenth Amendments. Stumpf v. Mitchell, 367 F.3d 594, 611 (6th Cir. 2004), vacated in part on other grounds sub nom. Bradshaw v. Stumpf, 545 U.S. 175 (2005). Here, as in the state court, there was not proof to support this claim, and thus this Brady claim fails as Petitioner has not established cause or prejudice.

### 6. Lesser Included Offense Instruction

As to his lesser-included offense instruction claim, Petitioner contends that the jury was not instructed that second-degree murder is a lesser included offense of felony-murder (where the underlying felony is aggravated child assault), and the jury convicted him of felony-murder. Tennessee appellate courts has recognized second-degree murder as a lesser included offense of felony-murder. Hodges, 2002 WL 31730872 at *4. After Petitioner's conviction, the Tennessee Supreme Court held that under Tennessee law, the jury must be instructed on those lesser included offenses when a defendant is tried for felony-murder. State v. Burns, 6 S.W.3d 453 (1999).

Petitioner relies upon Beck v. Alabama, 447 U.S. 625, 637-38 (1980), but concedes that the Supreme Court has never held that due process requires that that state courts must instruct a jury on lesser-included offenses. As the Supreme Court stated in Beck, "we have never held that a defendant is entitled to a lesser included offense instruction as a matter of due process." Id. at 637. The Sixth Circuit has declined to extend the principle to noncapital cases. Scott v. Elo, 302

40

F.3d 598 (6th Cir. 2002), Hodges raises this issue to preserve it for appeal. As a habeas action, the Court must "apply the rule of law that was clearly established at the time [the Petitioner's] state-court conviction became final." Williams, 529 U.S. at 390. Thus, because the state court properly applied the law of Tennessee at the time of Petitioner's conviction, this claim must fail.

### 7. Possibility of Parole Sentencing Claim

Petitioner's sentencing claim is that at the sentencing phase on whether Hodges' life sentence should include the possibility of parole, the trial court instructed the jury to consider whether the "murder was committed against a person less than twelve (12) years of age and the defendant was eighteen (18) years of age, or older." Tenn. Code. Ann. 39-13-204(i)(1). Given that his conviction included aggravated child abuse of a child under the age of six, Petitioner contends this factor did not meaningful narrow the class of defendants eligible for the sentence of life without parole. This claim is not supported by a controlling Supreme Court decision at the time of his sentencing.

Finally, Petitioner maintains his actual innocence of first-degree murder, but concedes his lack of any new evidence to establish his innocence. The facts presented meet the standards of Herrera v. Collins, 506 U.S. 390 (1993) and Schlup v. Delo, 513 U.S. 298, 324 (1995).

For these reasons, the Court concludes that Petitioner's application for the writ should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the ___11th___ day of August, 2010.

WILLIAM J. HAYNES, JR.
United States District Judge

41